Klonoski v. Mahlab                          CV-95-153-M    07/16/96

UNITED STATES DISTRICT COURT FOR THE
                         DISTRICT OF NEW HAMPSHIRE


Richard F. Klonoski, et al.,
     Plaintiffs

     v.                                          Civil No. 95-153-M

Benjamin Mahlab, et al.,
     Defendants.


                            O R D E R


     In this medical malpractice action, plaintiffs seek damages
for the wrongful death of Jolanta Klonoski, who died shortly
after giving birth to a healthy baby girl at Dartmouth Hitchcock
Medical Center.  Presently before the court are two motions to
compel production of documents and answers to interrogatories
filed by plaintiffs.  In the first, plaintiffs move to compel
defendants' production of certain notes and reports prepared by
Richard Burke, a claims manager and investigator employed by
American International Adjustment Claim Services, Inc. ("AIACS").
In the second motion to compel, plaintiffs seek the names of all
individuals known by defendants to have knowledge of discoverable
facts relating to this litigation as well as the subject matter
of that information.  Defendants object to the requested
disclosures, asserting the attorney-client privilege and/or the

work product doctrine.  For the reasons set forth below, both of plaintiffs' motions to compel are granted in part and denied in part.

## Background

Based upon the pleadings and affidavits submitted by the parties, the pertinent facts appear as follows.  On the morning of May 8, 1993, 37 weeks into her pregnancy, Mrs. Klonoski arrived at Dartmouth Hitchcock Medical Center ("DHMC") complaining of epigastric pain, diarrhea, and vomiting.  She was evaluated and maintained under observation until approximately 4:00 p.m., when she was permitted to return home.  Later that evening, neighbors brought Mrs. Klonoski back to the hospital. She was admitted, evaluated, and treated on Saturday night and during the early morning hours of Sunday, May 9, 1993.  Late Saturday night or early Sunday morning, Mrs. Klonoski began receiving treatment for preeclampsia.  Plaintiffs claim, among other things, that Mrs. Klonoski's preeclampsia should have been diagnosed much earlier and treated more aggressively.[1]

---

[1]  Preeclampsia is "[a] condition affecting pregnant women, usually after the 20th week of pregnancy, and predominantly in primigravidas (women pregnant for the first time).  It is marked by hypertension, proteinuria (protein in the urine), and edema (accumulation of fluid in tissues)."  J.E. Schmidt, Attorney's

At approximately 9:00 a.m. on Sunday morning, while in labor, Mrs. Klonoski suffered an intracranial bleed. After giving birth to a healthy baby girl, she was moved to the DHMC intensive care unit. Approximately 20 hours later, on Monday, May 10th, Mrs. Klonoski died.

Matson Sewell, a member of DHMC's risk management staff, was notified of Mrs. Klonoski's medical complications on Sunday, May 9, 1993. When she arrived at the hospital on the following day, Sewell learned that Mrs. Klonoski had passed away. She then began reviewing Mrs. Klonoski's medical records to determine how DHMC should proceed. Based upon her experience, and in light of the fact that deaths during childbirth are relatively rare, Sewell determined that there was a substantial likelihood that litigation would follow, even absent any actual negligence on the part of DHMC and its staff. Accordingly, she contacted Richard Burke of AIACS and asked that he conduct an investigation into the nature of Mrs. Klonoski's treatment and the circumstances surrounding her death. She instructed Burke to include in his investigation interviews with members of the DHMC staff who were involved in Mrs. Klonoski's care and treatment. She also

Dictionary of Medicine, at 360 (Supp. 1994).

3

instructed Burke to forward his reports to DHMC's legal counsel, for use in preparing for the anticipated litigation.

Pursuant to Sewell's instructions, Burke contacted attorneys Anil Madan and David Cleary (who regularly represent DHMC in cases involving medical malpractice), advised them of the circumstances surrounding Mrs. Klonoski's death, and solicited their advice concerning the nature, scope, and focus of his investigation. During the ensuing months, Burke met with several members of the DHMC medical staff who had participated in treating Mrs. Klonoski. He also met with other DHMC staff members who, although not directly involved in Mrs. Klonoski's care, were generally familiar with preeclampsia, eclampsia, and the neurological condition which ultimately caused her death. Within a few days of each of those meetings, Burke prepared written reports based upon his notes. Burke did not ask the individuals with whom he met to review his notes for accuracy nor did he ask them to sign witness statements, as that term is used in Fed. R. Civ. P. 26(b)(3).

4

**Discussion**

I.  Attorney-Client Privilege.

Defendants concede that New Hampshire, rather than federal, law governs the extent (if any) to which the attorney-client privilege shields Mr. Burke's notes from discovery. Defendants' Memorandum of Law in Support of Objection to Motion to Compel, at 4. See, Fed. R. Evid. 501. The New Hampshire Supreme Court has summarized the attorney-client privilege as follows:

> Where legal advice of any kind is sought from a professional legal adviser in his capacity as such, the communications relating to that purpose, made in confidence by the client, are at his instance permanently protected from disclosure by himself or by the legal adviser unless the protection is waived by the client or his legal representative.

Riddle Spring Realty Co. v. State, 107 N.H. 271, 273 (1966). Rule 502 of the New Hampshire Rules of Evidence codifies the common law attorney-client privilege and provides, in pertinent part:

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client (1) between the client or his or her representative and the client's lawyer or the lawyer's representative . . ..

N.H. Evid. R. 502(b) (emphasis added).

Defendants argue that when Mr. Burke prepared the reports in question, he was acting as a "representative of a lawyer" (i.e., Attorney Cleary) as that term is defined in N.H. Evid. R. 502(a). Accordingly, they assert that his reports, which contain statements from DHMC employees, are protected from disclosure by the attorney-client privilege. As an integral component of their argument, defendants assert that each of the individuals to whom Burke spoke is a "representative of a client" (i.e., DHMC) simply by virtue of his or her status as an employee of DHMC. While arguably consistent with the federal common law of attorney-client privilege, see Upjohn Co. v. United States, 449 U.S. 383 (1981), defendants' position is at odds with New Hampshire's more narrow construction of that privilege. The Reporter's Notes to N.H. Evid. R. 502 make that plain:

> Uniform Rule 502(a)(2) adopts a definition [of "representative of a client"] in terms of authority to obtain or act upon the basis of legal services, the so-called "control group" test, which the Federal Advisory Committee described as the "most restricted position." . . . The approach of the Uniform Rule has been adopted, because it is consistent with the purpose of the privilege to encourage communication without unduly inhibiting trial preparation in the special context of corporate activity. The "control group" test is preferable to the principal alternative, which is that the privilege cover any employee communication to counsel directed by the employer and referring to the performance of his duties. This approach would permit a corporation to insulate all of its normal fact

6

gathering about a matter by using the medium of communication with counsel for it.

N.H. Evid. R. 502, Reporter's Notes.

Defendants have not cited any New Hampshire cases which, contrary to the language quoted above, stand for the proposition that statements made by any employees of a corporate defendant (regardless of their decision-making authority) to the corporation's legal counsel (or its agent) are necessarily shielded by the attorney-client privilege. Nor have defendants attempted to demonstrate how (or even if) the employees with whom Burke spoke fall within the contemplated scope of New Hampshire's attorney-client privilege (i.e., that they are within the so-called "control group" at DHMC).[2]

Instead, defendants simply assert that all statements made by a "client" to an agent of his or her attorney are shielded from discovery if made for the purpose of obtaining legal advice. That argument does not, however, address the critical question

_____

[2] As noted above, the New Hampshire Rules of Evidence employ the "control group" test and define "representative of a client" as "one having authority to obtain professional legal services, or to act on advice rendered pursuant thereto, on behalf of the client." N.H. Evid. R. 502(a)(2).

7

presented in this case: Who are the "representatives of the client" whose statements are entitled to protection? Of course, the essence of the attorney-client privilege is a confidential communication between and attorney and his or her <u>client</u>. <u>Riddle Spring</u>, 107 N.H. at 273. Having failed to establish that the employees with whom Burke spoke qualify under New Hampshire's privilege as "clients" or "representatives of a client," defendants' assertion of the attorney-client privilege with regard to Burke's reports necessarily fails.

The court is not inclined to stretch the precise language employed in New Hampshire's rules of evidence to cover the facts presented in this case, given the absence of any state precedent suggesting that the New Hampshire Supreme Court would likely expand the privilege's reach beyond the "control group." A federal court called upon to apply state law must "take state law as it finds it: `not as it might conceivably be, some day; nor even as it should be.'" <u>Kassel v. Gannett Co.</u>, 875 F.2d 935, 950 (1st Cir. 1989) (quoting <u>Plummer v. Abbott Laboratories</u>, 568 F. Supp. 920, 927 (D.R.I. 1983)). When state law has been authoritatively interpreted by the state's highest court, this court should apply that law according to its tenor. <u>Kassel</u>, 875

8

F.2d at 950.  Where the signposts are blurred, the federal court may assume that the state court would adopt an interpretation of state law that is consistent with logic and supported by reasoned authority.  Moores v. Greenberg, 834 F.2d 1105, 1107 n.3 (1st Cir. 1987).  However, this court is and should remain hesitant to blaze new, previously uncharted state-law trails.  Expansive reading of New Hampshire statutes and rules of evidence and the broadening of evidentiary privileges available under them is a function best left to the New Hampshire Legislature and Supreme Court.

II.  The Work Product Doctrine.

"At its core the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case."  United States v. Nobles, 422 U.S. 225, 238 (1975).  Rule 26(b)(3) establishes the parameters of the work product doctrine, and provides:

> [A] party may obtain discovery of documents and
> tangible things otherwise discoverable under
> subdivision (b)(1) of this rule and prepared in
> anticipation of litigation or for trial by or for
> another party or by or for that other party's
> representative (including the other party's attorney,
> consultant, surety, indemnitor, insurer, or agent) only

9

> upon a showing that the party seeking discovery has a substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means.

Fed. R. Civ. P. 26(b)(3). Accordingly, the work product doctrine encompasses: (1) documents and other tangible things; (2) which were prepared in anticipation of litigation or trial; (3) by or for a party or by or for that party's representative. Pacamor Bearings, Inc. v. Minebea Co., 918 F. Supp. 491, 512 (D.N.H. 1996). Defendants have established that each of those three criteria has been met with regard to Burke's reports. That, however, does not end the inquiry.

As is evident from the plain meaning of the rule, the work product doctrine provides a qualified, rather than absolute, privilege. Nobles, 422 U.S. at 239. To that end, it "is designed to balance the needs of the adversary system to promote an attorney's preparation in representing a client against society's general interest in revealing all true and material facts relevant to the resolution of a dispute." Pacamor Bearings, Inc. v. Minebea Co., 918 F. Supp. at 512 (quoting Loustalet v. Refco, Inc., 154 F.R.D. 243, 246 (C.D. Cal. 1991)).

10

The work product doctrine encompasses both "`opinion' work product and `ordinary' work product -- the former category encompassing materials that contain the mental impressions, conclusions, opinion or legal theories of an attorney, the latter category embracing the residue."  In re San Juan Dupont Plaza Hotel Fire Litigation, 859 F.2d 1007, 1014 (1st Cir. 1988). Having reviewed in camera the reports which are the subject of the parties' discovery dispute and having found that the three requirements of Rule 26(b)(3) have been met, the court finds that Mr. Burke's reports constitute "ordinary" work product.  They are, therefore, not entitled to the heightened protection from disclosure normally afforded "opinion" work product.  See Upjohn, 449 U.S. at 401-02 (in order to obtain "opinion" work product, a party must make "a far greater showing of necessity and unavailability by other means" than that required to obtain discovery of "ordinary" work product).

Nevertheless, plaintiffs may obtain discovery of those reports "only upon a showing that [they have] substantial need of the materials in the preparation of [their] case and that [they are] unable without undue hardship to obtain the substantial equivalent of the materials by other means."  Fed. R. Civ. P.

11

26(b)(3). With regard to the following reports, plaintiffs have demonstrated that they have a substantial need for the materials in question in order to prepare their case and that they are unable, without undue hardship, to obtain the substantial equivalent of the information contained therein (basically, because the witnesses state they are now unable to recall many of the important details surrounding Mrs. Klonoski's treatment):

1.    Interview of Irit Librot, R.N.  (5 pages);

2.    Interview of Rhonda White, R.N. (5 pages);

3.    Interview of Linda Bowers (5 pages);

4.    Interview of Tamara Krivit (4 pages), with the exception of one sentence on page 2, which the court has redacted as opinion work product;

5.    Interview of Mary Spain, R.N. (6 pages);

6.    Interview of Sharon Parent, R.N. (5 pages);

7.    Interview of Peter Abt (4 pages);

8.    Interview of Jenny Shad, R.N. (5 pages); and

9.    Notes from interview of Mary Ellen Grant, Shift R.N. (14 pages).

Accordingly, defendants shall produce those reports.


With regard to the few remaining reports prepared by Mr. Burke and submitted to the court for in camera review, plaintiffs

12

have failed to demonstrate that they cannot, without undue hardship, obtain the substantial equivalent of the information which they contain. Those notes and reports are, therefore, shielded from discovery by the work product doctrine and need not be produced at this time.

III. Plaintiffs' Second Motion to Compel.

Finally, plaintiffs seek production from defendants of all "documents and information regarding individuals having knowledge of discoverable facts in this litigation and the subject matter of that information." Plaintiffs' Second Motion to Compel at 8. To the extent defendants claim that such information is privileged and, therefore, shielded from discovery, plaintiffs seek a privilege log under Fed. R. Civ. P. 26(b)(5). Additionally, plaintiffs move the court to enter a protective order "to prevent inappropriate dissemination of unsubstantiated innuendo and rumor." Plaintiffs' Second Motion to Compel at 8.

In response, defendants claim to have already provided plaintiffs with the names, addresses, and employment positions of 23 individuals believed to have knowledge of discoverable facts relating to this litigation. They say they have given detailed

13

responses to plaintiffs' discovery requests, and they are no doubt well aware of their continuing obligation to supplement those answers if they acquire additional responsive information. In light of the substantial discovery already provided to plaintiffs regarding individuals involved in Mrs. Klonoski's medical care, the object of their motion to compel appears to relate specifically to individuals with knowledge of: (1) marital difficulties that the Klonoskis may have been experiencing prior to Mrs. Klonoski's death; and (2) issues concerning the newborn baby's paternity. See Plaintiffs' Second Motion to Compel at 3-5.

In defense of their investigations into those issues, defendants assert that because plaintiffs seek, among other things, damages for loss of consortium and loss of household services, their inquiry into possible marital difficulties is plainly relevant to damages issues. Similarly, they claim that their investigation into the issue of the baby's paternity is particularly relevant because the Klonoskis apparently had an "infertility workup" and, therefore, defendants claim that Mrs. Klonoski may have been impregnated with donated sperm through an artificial insemination donor ("AID") program. Defendants point

14

out that if Mrs. Klonoski had been artificially inseminated with donated sperm, that information was not provided during Mrs. Klonoski's pregnancy and it would have been extremely important information for Mrs. Klonoski's physicians to have, because medical literature recognizes a higher incidence of preeclampsia in women who have participated in AID programs. Defendants also say that such information would have been important because it is rare for a woman who has had two prior unremarkable pregnancies, like Mrs. Klonoski, to develop preeclampsia in her third pregnancy when all three children have been fathered by the same individual. Accordingly, defendants seem to suggest that pursuit of their investigation into the child's paternity might provide both an explanation for the otherwise highly unusual preeclampsia, and a reasonable explanation (i.e., absence of critical information) for the delay in reaching that diagnosis.

Defendants' inquiries into the areas of paternity and potential marital strife, although legally relevant, understandably have caused Dr. Klonoski some anxiety. Apparently in an effort to bring such inquiries to a halt, by exposing defendants' conduct as nothing more than a "fishing expedition" designed to upset Dr. Klonoski, plaintiffs have asked defendants

15

to produce a list of all individuals known to them who might have information on those subjects and to disclose the nature of that information. Presumably, plaintiffs wish to demonstrate that defendants lack any good faith basis for pursuing "rumors" of marital discord, infidelity, and/or artificial insemination.

Defendants take issue with plaintiffs' unflattering characterization of their discovery efforts, countering that they have a legitimate and good faith basis for making such inquiries. They resist plaintiffs' efforts to discover the fruits of those inquiries, however, arguing that plaintiffs have far greater knowledge of, and access to, any such information. In essence, defendants claim that both parties (and particularly Dr. Klonoski) are aware of the "pool" of individuals with whom Dr. Klonoski associated and in whom he might have confided with regard to matters of marital discord. Because they believe that plaintiffs are already aware of all individuals who might have such information, defendants view plaintiffs' discovery request as little more than an artful effort to obtain their work product.

16

Defendants assert that "the identity of individuals with specific information, culled through the industrious efforts of defense counsel and their representatives, is protected work product." Defendants' Objection at 8. They say that "[t]he intangible product of defense counsel's work, i.e., the knowledge of who has relevant information on this subject, is no less deserving of protection from discovery than the tangible product of this work, i.e., memoranda, written or transcribed statements and counsel's notes." Defendants' Objection at 9. They conclude by arguing that "[i]f plaintiffs' expansive interpretation [of the rules of discovery] is adopted by the Court, defense counsel could most easily comply with the disclosure burden by inviting plaintiffs' paralegal to work in defense counsel's office and accompany defense counsel to all investigation interviews." Id.

Citing In re San Juan, supra, defendants argue that plaintiffs' request for the names of all individuals known by them to have knowledge of discoverable information is akin to a premature request for defendants' trial exhibit list, which the Court of Appeals has noted could intrude upon an attorney's trial strategy and, therefore, implicate the work product doctrine. Defendants' arguments, however, overstate plaintiffs' request.

17

At this time, plaintiffs do not seek a list of witnesses defendants intend (or even expect) to call at trial. Their request is broader and, therefore, disclosure is less likely to encroach upon defense counsel's assessment of the case, or reveal trial strategy.

Accordingly, defendants shall produce a list of all persons known by them to possess discoverable information related to: (1) marital discord between Dr. and Mrs. Klonoski; and (2) the paternity of Dr. Klonoski's youngest daughter. To the extent defendants can more persuasively support their assertion that such a list (or the names of particular people which would otherwise appear on such a list) is protected by the work product doctrine (i.e., with references to precedent and/or scholarly writings on the subject), they shall provide plaintiffs with a privilege log as contemplated by Fed. R. Civ. P. 26(b)(5) and a list of cases and/or scholarly writings which specifically support their claim of privilege. Plaintiffs will, of course, then be free to file an appropriate motion to compel.

18

## Conclusion

Plaintiffs' Motion to Compel Production of Documents (document no. 12) is granted in part and denied in part, as more specifically set forth above.  Defendants shall produce the reports prepared by Mr. Burke and identified in this order as discoverable on or before August 14, 1996.  Plaintiffs' Second Motion to Compel Information and Documents (document no. 23) is granted in part and denied in part.  Defendants shall produce a list of the names of individuals having knowledge of discoverable information relating to the issues of marital discord and paternity <u>and</u> a general description of the nature of that information on or before August 14, 1996.  To the extent that defendants are able, in good faith, to legally support an assertion of privilege with regard to some or all of those names, they shall produce a privilege log as described above. Plaintiffs' request for a protective order is denied.

19

SO ORDERED.

_____
Steven J. McAuliffe
United States District Judge

July 16, 1996

cc:  Donald J. Williamson, Esq.
     Joan A. Lukey, Esq.
     James P. Bassett, Esq.